IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| APT SYSTEMS, INC., | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 21-2121 |
| | : | |
| v. | : | |
| | : | |
| APPLE, INC., | : | |
| | : | |
| Defendant. | : | |

**<u>MEMORANDUM OPINION</u>**

Smith, J.                                                                                          January 26, 2022

      The plaintiff purchased and enhanced an app which was then made available for purchase on the defendant's app store. Unfortunately, a third party stole the access information for this app and, *inter alia*, changed the account information so that any subscriber fees for the app went to a different bank account than the one that the plaintiff had set up with the defendant. Although the plaintiff raised the issue of the theft of its app with the defendant's support services, it alleges that it was unable to get a resolution of the issue despite months of correspondence and negotiation with the defendant, in large part because the defendant seemingly would not recognize that the plaintiff owned the app. The plaintiff asserts that it lost not only the subscriber fees for the app for numerous months but future revenue once the defendant ultimately removed the app from its app store.

      After unsuccessfully attempting to resolve its issues with the theft of its app by communicating with the defendant, the plaintiff filed an action in a Pennsylvania state court. The defendant then removed the matter here claiming that this court has diversity jurisdiction over this matter. The plaintiff later amended its complaint to attempt to claim an amount in controversy that

was below the $75,000 amount-in-controversy threshold set in the diversity jurisdiction statute, 28 U.S.C. § 1332(a). It also moved to have this court remand the matter to the state court based on the allegations in the amended complaint because the amount in controversy no longer exceeded the jurisdictional threshold of $75,000.

The defendant opposes this court remanding the matter, and it has separately moved to have the court dismiss the amended complaint or, in the alternative, transfer this action to the United States District Court for the Northern District of California. Upon reviewing the motion to transfer, the court required the parties to brief this part of the defendant's motion and then heard oral argument on the motion to transfer and the plaintiff's motion to remand.

As discussed in more detail below, the court will deny the motion to remand and grant the motion to transfer. With respect to the motion to remand, the court cannot consider the amended complaint in which the plaintiff attempted to defeat federal jurisdiction by, *inter alia*, seeking damages in amount that would not reach the $75,000 threshold. The court therefore could only review the original complaint, which did not limit the sought-after damages to $75,000 or a lower amount. The allegations in the original complaint show that the plaintiff was seeking an amount in excess of $75,000, and the plaintiff has not shown to a legal certainty that it could not recover in excess of $75,000 based on that original complaint. As such, the court cannot remand this matter to the state court.

Concerning the motion to transfer, the defendant and the plaintiff are bound by a valid forum selection clause, which requires that the court transfer this case to the Northern District of California. In this regard, the court does not find that (1) the forum selection clause is the result of fraud or overreaching, (2) its enforcement would violate a strong public policy of this forum, or

(3) its enforcement would result in litigation so seriously inconvenient and unreasonable that it would deprive the plaintiff of its day in court. Further, the plaintiff has not shown that the relevant public interests overwhelmingly disfavor transferring this case to the Northern District of California.

## I.      ALLEGATIONS AND PROCEDURAL HISTORY

The original plaintiffs, APT Systems, Inc. ("APT") and Snapt Games, Inc. ("Snapt"), commenced this action by filing a complaint against the defendant, Apple, Inc. ("Apple"), in the Court of Common Pleas of Berks County on April 5, 2021.[1] *See* Notice of Removal, Ex. A, Compl., Doc. No. 1-1. In general, the original plaintiffs' allegations related to a third-party "thief" gaining access to their Apple account and operating an app that the plaintiffs owned. *See* Compl. at ECF pp. 4–6. This thief obtained the revenue from subscribers' use of the app, and the plaintiffs claimed that Apple refused to give them access to their app and the revenue associated with it despite the plaintiffs having provided Apple with proof of ownership of the app. *See id.* at ECF pp. 5–9. Based on these allegations, the plaintiffs asserted causes of action for (1) breach of bailment, (2) conversion, (3) intentional interference of contractual and business relations, and (4) unjust enrichment. *See id.* at ECF pp. 9–14. For relief, the plaintiffs sought, *inter alia*, (1) consequential and compensatory damages, (2) an accounting, (3) attorney's fees, (4) equitable relief in the nature of requiring Apple to establish an App Store Ombudsman, which "under this court's order and oversight, . . . [would] fairly, efficiently and expeditiously address issues of nature, among others, faced by Plaintiffs," and (5) punitive damages (relating to the conversion cause of action). *See id.* at ECF pp. 11, 12, 13, 14.

---

[1] This matter was initially assigned to the Honorable Jeffrey L. Schmehl.

Apple received a copy of the complaint on April 23, 2021. *See* Notice of Removal at ¶ 3. On May 7, 2021, Apple removed the case from the Court of Common Pleas of Berks County to this court under 28 U.S.C. §§ 1332 and 1441 based on this court's diversity jurisdiction. *See id.* at ¶ 6. In the notice of removal, Apple claims that the parties are completely diverse because it is a citizen of California, and the plaintiffs are citizens of Delaware and Pennsylvania. *Id.* at ¶¶ 8–10. Apple also asserts that the matter satisfies the $75,000 amount-in-controversy requirement because (1) "a reasonable interpretation of Plaintiffs' requested relief, including for compensatory and consequential damages, makes it clear that the amount requested exceeds the $75,000 threshold," and (2) the parties exchanged letters (which were referenced in the complaint) where the plaintiffs demanded $225,000 in direct damages. *See id.* at ¶¶ 11–12.

On June 25, 2021, Apple filed a motion to dismiss the complaint or, in the alternative, to transfer venue to the United States District Court for the Northern District of California. *See* Doc. No. 4. On July 12, 2021, Judge Schmehl approved a stipulation extending the time for the plaintiffs to respond to the motion to dismiss until August 9, 2021. *See* Doc. No. 8. On July 30, 2021, Chief Judge Juan R. Sanchez reassigned this matter from Judge Schmehl's calendar to the undersigned's calendar. *See* Doc. No. 19.

On August 9, 2021, APT responded to the motion to dismiss by filing an amended complaint.[2] *See* Doc. No. 21. The amended complaint contains similar allegations as the original complaint but as discussed below, it changes the requested relief and removes a cause of action.

---

[2] Interestingly, APT is listed as the sole plaintiff in the caption, but the first line of the amended complaint states that the plaintiff is only Snapt. *See* Compl. at 1 ("Plaintiff Snapt Games, Inc. by its undersigned counsel, hereby demand judgment against Defendant, Apple Inc. . . . ."); *id.* at ¶ 1 ("Plaintiff Snapt Games, Inc. ("Snapt") is a Delaware corporation and wholly owned subsidiary of APT Systems, Inc. a Delaware corporation."). Based on the representations in the amended complaint, the court has considered Snapt to be the relevant plaintiff in the amended complaint.

Regarding the allegations in the amended complaint, the plaintiff alleges that in April 2018, Snapt purchased "ThemeZone Live Wallpapers" App (the "App"), which is a "subscription fee generating live wallpaper App," from a third-party developer for $36,000. *See* Am. Compl. at ¶ 6, Doc. No. 21. The App was hosted on Apple's App Store. *See id.*

Promptly after purchasing the App, Snapt took control over the associated developer account. *See id.* at ¶ 8. It changed the administrative contact details and modified App support to link to Snapt's official website. *See id.* It also changed the bank account associated with the App to its bank account. *See id.*

By early May 2018, Snapt determined that Apple was not depositing the App's subscription fees to Snapt's bank account. *See id.* at ¶ 9. Instead, Apple sent those funds to the App's prior owner. *See id.* at ¶ 10.

Snapt's CEO contacted Apple about this banking issue, and Apple began depositing Snapt's portion of the App's subscriber fees into Snapt's bank account starting on June 7, 2018. *See id.* at ¶ 11. Thereafter, the subscriber fees would arrive in Snapt's bank account generally within 60 days after Apple would collect the fees from the App's subscribers. *See id.*

In mid-January 2019, Snapt could no longer access its developer account for the App, and Snapt contacted Apple to inquire about this issue. *See id.* at ¶ 12. Apple's support staff required proof of Snapt's ownership of the App, so Snapt's CEO e-mailed documents showing its proof of ownership to Apple on February 1, 2019. *See id.* at ¶ 13. Snapt's CEO continued to place follow-up phone calls and e-mail messages to Apple's support staff to address the accessibility issue with its App. *See id.* at ¶¶ 13, 15–17.

Apple's support staff "escalated" the accessibility issue to Apple's "operations team" so it could review and process the issue. *See id.* at ¶ 14. While the issue was with the operations team, Snapt's CEO informed Apple that the App was getting bad reviews due to unauthorized changes, and she also sought information about where the subscriber fees were being sent. *See id.* at ¶ 17. The operations team finally completed its review of the accessibility issue and, on February 26, 2019, Apple e-mailed Snapt's CEO to inform her that it could not help because the operations team could not verify Snapt's Apple ID and control of the account. *See id.* at ¶ 18.

Snapt's CEO continued to try to get the accessibility issue resolved with Apple. On March 19, 2019, she e-mailed the following message to Apple:

> The app was stolen from us and the revenue as well. We cannot verify or authenticate because the questions have been edited and changed by the person who took the app and account away from us. We provided proof of ownership already and our website is still associated with the app in your store. . . . We are getting emails from people who bought the app that we cannot serve. How in good conscience can Apple let this crime go on?

*Id.* at ¶ 19. In response to this e-mail, an Apple "senior Advisor with Apple Developer Program Support" stated:

> After thoroughly reviewing your case I understand your company purchased an app and hired a developer to manage it. The developer gained access to your Apple ID and changed the information associated with the Apple ID so you can no longer access it. . . . Finally, I see that you requested to report that an app, "ThemeZone – Live Wallpapers," is in violation of the App Store Guidelines by using your organization's website URL for the app's support URL. Although I cannot set expectations that our App Store Review team will be able to follow up with you on this report, I will submit your request for an update to their teams for consideration . . . .

*Id.* at ¶ 20.

A little over a month later, Snapt's CEO again e-mailed Apple to ask what additional information it needed from her after she had already provided it with proof of ownership

documentation. *See id.* at ¶ 21. Three days later, Snapt's CEO received an e-mail from Apple's "App Disputes," which read:

> Thank you for your response. According to our records, you are listed as the Administrator/Legal contact on this provider account. . . . Please note that we only handle claims of intellectual property infringement on the App Store. For all technical support and account related questions, please contact the App Store Connect Team . . . .

*Id.* at ¶ 22 (alteration omitted).

Due to Snapt's inability to retain control over the App and its revenue stream, it "suffered severe consequential effects." *Id.* at ¶ 23. In this regard, it could not justify continuing to pay its in-house app developer to work on existing and new applications. *Id.* In addition, APT had set up Snapt to financially support it, and without that financial support, APT went "dark in the summer of 2020, [which caused] deleterious effects upon APT's shareholders." *Id.* at ¶ 24.

After unsuccessfully attempting to resolve its issue with Apple, Snapt then engaged outside counsel to attempt to resolve the issue. *See id.* at ¶ 25. After some initial correspondence between counsel for the parties, Apple's counsel agreed that Snapt had lost access to the App via a letter dated October 6, 2020. *See id.* at ¶¶ 26–28. This caused Apple to remove "Snapt as the unauthorized support developer for [the App], as requested." *Id.* at ¶ 28. According to Snapt, Apple counsel's October 6th letter also:

- indicated that Apple would "cooperate to the extent possible in any action taken by Snapt against the individuals who it believes to have wrongfully subverted the developer account at issue." *Id.*

- informed Snapt that the "wrongful subverter"/thief refused to support the App independently of Snapt's website, which caused Apple to remove the App from the Apple Store.[3] *See id.* at ¶ 29.

---

[3] According to Snapt, this resulted in an immediate denial of access to over 73,000 paid App subscribers and cessation of [the App] generating any future revenue." Am. Compl. at ¶ 29.

- informed Snapt that the "wrongful subverter"/thief possibly was the foreign developer who sold the App to Snapt. *See id.* at ¶ 30.

- informed Snapt that Apple had changed the App's associated bank account from Snapt's Wells Fargo bank account to a Russian bank account, which resulted in Snapt not receiving the App's subscription fees collected by Apple since February 1, 2019. *See id.*

- indicated that Snapt's website was being used to support two other apps that Snapt did not own.[4] *See id.* at ¶ 31.

Along with this correspondence, Snapt's counsel demanded that Apple return control over the developer account to Snapt, restore ownership of the App to Snapt, and account for and reimburse Snapt for all lost App subscription revenue for which Apple "shared its split with a thief since February 1, 2019." *Id.* at ¶ 32. Apple resisted these demands, and it took the position that it could not be entirely sure if Snapt was the true owner of the App and its associated developer's account. *See id.* at ¶ 33. To date, Snapt has "received no satisfaction from Apple regarding [its] repeated requests to address and rectify their loss of [the App] and associated cash subscription fees, as well as the unauthorized appropriation of Snapt's website to support" two other apps. *See id.* at ¶ 37.

Based on these allegations, Snapt asserts causes of action for (1) breach of bailment, (2) conversion, and (3) intentional interference of contractual and business relations.[5] *See id.* at 7–11. For each cause of action, Snapt seeks:

> a full and proper accountings [sic] and judgment for compensatory and consequential damages of Seventy Thousand Dollars ($70,000) against Defendant, plus attorney fees, interest, costs, and any further relief deemed appropriate by this Honorable Court. Plaintiffs further seek equitable relief to cause Defendant Apple to establish an "App Store Ombudsman" ("ASO"). This should require Apple,

---

[4] Upon learning about this "alarming news," Snapt advised Apple's counsel to tell Apple to remove Snapt's support for these other unauthorized apps. *See* Am. Compl. at ¶ 31.
[5] Snapt dropped the unjust enrichment claim asserted in the original complaint.

under this Court's order and oversight, to institute a dedicated ASO office to create a publicly available mechanism to fairly, efficiently and expediently address issues of nature, among others, faced by Plaintiffs [sic].

*Id.* at 9, 10, 11.[6]

The court is currently presented with two outstanding substantive motions. The first is Apple's motion to dismiss the amended complaint or, in the alternative, to transfer venue, which it filed on August 18, 2021. *See* Doc. No. 23. Snapt filed its opposition to this motion on September 1, 2021, *see* Doc. No. 28, and Apple filed a reply in further support of its motion on September 3, 2021.

The second motion is Snapt's motion to remand this matter to the Court of Common Pleas of Berks County. *See* Doc. No. 26. Apple filed a response in opposition to this motion on September 1, 2021. *See* Doc. No. 27.

The court held oral argument on both motions on September 8, 2021. The motions are ripe for disposition.

## II.    DISCUSSION

### A.    Snapt's Motion to Remand

In its motion to remand, Snapt claims that this court must remand this matter to the Court of Common Pleas of Berks County because of a lack of subject-matter jurisdiction. *See* Mem. of Law in Supp. of Pl.'s Mot. to Remand at 4–5, Doc. No. 26. More specifically, Snapt contends that this court lacks diversity jurisdiction over this action because the amount in controversy does not exceed $75,000 because it "specified its damages in an amount not to exceed $75,000" in the amended complaint. *See id.* at 3, 4–5. Snapt asserts that the court should consider this claimed

---

[6] Snapt no longer seeks punitive damages for its conversion claim.

amount as the proper amount in controversy because it did not know its actual lost revenue numbers when it filed the original complaint. *See id.* at 3. It apparently received the lost revenue numbers from Apple after filing the complaint, and those numbers show that the amount in controversy would not exceed $75,000. *See id.*

In response to the motion to remand, Apple first asserts that the court must review the original complaint (and not the amended complaint) when determining whether the court has diversity jurisdiction over this removed action. *See* Def. Apple Inc.'s Mem. of Law in Opp'n to Pl.'s Mot. to Remand ("Remand Opp'n") at 4, Doc. No. 27. Apple notes that a plaintiff cannot attempt to divest a federal court of jurisdiction simply by amending the complaint to assert a request for damages that is less than the jurisdictional amount. *See id.* Apple further asserts that in this case, a review of the original complaint shows that the amount in controversy exceeds the diversity jurisdiction threshold because, *inter alia*, the plaintiffs (1) asserted that it spent $36,000 for the App and spent an additional $7,000 to enhance the App; (2) sought all App subscription fees from February 1, 2019, to date; (3) claimed that their commercial reputation was "denigrated"; and (4) sought equitable relief and attorney's fees. *See id.* at 5–6.

Apple also contends that even if the court viewed the amended complaint in determining whether diversity jurisdiction exists in this case, the amended complaint also contains allegations showing that the amount in controversy exceeds the jurisdictional threshold. *See id.* at 7. As with its argument regarding the original complaint, Apple points out that the amended complaint seeks damages for lost revenue and lost value from the App, harm to its reputation, equitable relief, and attorney's fees. *See id.* Apple contends that nothing in the amended complaint or the motion to

10

remand clearly shows that Snapt could never recover the sum necessary to support diversity jurisdiction. *See id.*

As a final argument, Apple argues that Snapt's contemporaneous representations contradict its subsequently reduced damages. *See id.* at 7–9. Apple points out that, pre-suit, Snapt sent correspondence to Apple indicating that it was seeking a minimum of $180,000 and had retained a forensic vendor to reach this damages calculation. *See id.* at 7–8 (citing Sept. 1, 2021 Decl. of John J. Calandra at ¶ 3). Apple contends that the court can consider Snapt's own estimation of its claim when determining whether the complaint satisfied the jurisdictional amount. *See id.* at 8 (citations omitted).

After reviewing the parties' submissions and the applicable record, the court must deny the motion to remand. As an initial point in this analysis, the court must determine which party has the burden to show that the court has subject-matter jurisdiction in this case. Upon review, it appears that district courts in Pennsylvania have reached conflicting decisions on this issue. *Compare Weiss v. Friedman Realty Group, Inc.*, Civ. A. No. 20-3671, 2020 WL 5501314, at *1 (E.D. Pa. Dec. 2, 2020) (explaining, in addressing plaintiff's motion to remand, that "[a] defendant removing a case from state court under § 1332(a) bears the burden of demonstrating, by a preponderance of the evidence, that the opposing parties are citizens of different states and the amount in controversy exceeds the $75,000 jurisdictional threshold" (citations omitted)); *Kopko v. Range Resources-Appalachia, LLC*, No. 2:20-CV-423-MJH, 2020 WL 3496277, at *1 (W.D. Pa. June 29, 2020) ("It is the removing party's burden to demonstrate that the amount in controversy exceeds the jurisdictional amount." (citations omitted)); *Hatchigian v. AAA Mid-Atlantic Member Relations*, Civ. A. No. 19-4740, 2020 WL 2745742, at *4 (E.D. Pa. May 27,

2020) ("Since the burden of establishing jurisdiction always lies with the removing defendant, it is Defendants' obligation to establish by a preponderance of the evidence the requisite jurisdictional amount." (citation omitted)); *Coggins v. Keystone Foods, LLC*, 111 F. Supp. 3d 630, 633 (E.D. Pa. 2015) ("The defendant has the burden of proving the action was properly removed." (citation omitted)), *with Wilson v. Hartford Cas. Co.*, 492 F. Supp. 3d 417, 423 (E.D. Pa. 2020) ("It is not the removing defendant's burden to prove to a legal certainty that the plaintiff is entitled to recover more than $75,000 when the plaintiff has not specifically averred in the Complaint that he or she is entitled to an amount below the jurisdictional threshold. In seeking remand, the challenger to subject matter jurisdiction must prove to a legal certainty that amount in controversy could not exceed the statutory threshold."). It also appears that Apple believes that it has the burden to justify the court not remanding this matter. *See* Remand Opp'n at 9 ("Apple has met ***its burden*** of establishing that the amount in controversy at the time of removal exceeded $75,000." (emphasis added)).

Although Apple places the burden on itself here, Snapt has the burden of demonstrating that the amount-in-controversy requirement is not satisfied.[7] With motions to remand, there are two scenarios, with the burden of proof changing depending on the scenario. The first scenario is where "the complaint specifically avers that the amount sought is less than the jurisdictional minimum." *Frederico v. Home Depot*, 507 F.3d 188, 196–97 (3d Cir. 2007). In this scenario, "a defendant seeking removal must prove to a legal certainty that plaintiff can recover the jurisdictional amount." *Id.* at 197. The second scenario occurs where "the plaintiff has not

---

[7] Even if Apple had the burden, the court would find that it demonstrated to a legal certainty that the amount in controversy sought in the original complaint exceeds $75,000, exclusive of interest and costs.

specifically averred in the complaint that the amount in controversy is less than the jurisdictional minimum." *Id.* In this scenario, "the case must be remanded if it appears to a legal certainty that the plaintiff *cannot* recover the jurisdictional amount." *Id.* Also, in this second scenario, "the *challenger* to subject matter jurisdiction ha[s] to prove, to a legal certainty, that the amount in controversy *could not exceed* the statutory threshold." *Id.* at 195 (citations and footnote omitted).

Here, the original complaint did not specifically aver that the amount in controversy was less than $75,000, *see* Compl. at 10, 11, 12, 13, so the second scenario is applicable. As such, the court must determine whether it appears to a legal certainty that Snapt cannot recover the jurisdictional amount.

In determining whether Snapt can recover the jurisdictional amount, the court must review the allegations in the original complaint. *See Coulter v. Paul Laurence Dunbar Cmty. Ctr.*, 685 F. App'x 161, 164 (3d Cir. 2017) (per curiam) ("The amount in controversy for diversity purposes is determined **as of the filing of the complaint**. Thus, the District Court either had or did not have diversity jurisdiction at that time." (emphasis added) (internal citations omitted)); *Spectacor Mgmt. Group v. Brown*, 131 F.3d 120, 122 (3d Cir. 1997) (explaining that amount in controversy "is determined from the good faith allegations appearing on the face of the complaint"). Also, in removal actions, "[a] district court's determination as to the amount in controversy must be based on the 'plaintiff's complaint at the time the petition for removal was filed.'" *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 666 (3d Cir. 2002) (quoting *Steel Valley Auth. v. Union Switch Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987)), *abrogated on other grounds by Earl v. NVR, Inc.*, 990 F.3d 310 (3d Cir. 2021); *see also Lieb v. Allstate Prop. & Cas. Ins. Co.*, 640 F. App'x 194, 196 (3d Cir. 2016) ("When assessing whether allegations in a state-court complaint are sufficient to support

removal to federal court, we look to the complaint that was in effect when removal occurred."). Moreover, "[a] subsequent amendment to the complaint after removal designed to eliminate the federal claim will not defeat federal jurisdiction." *Westmoreland Hosp. Ass'n v. Blue Cross of W. Pa.*, 605 F.2d 119, 123 (3d Cir. 1979) (citation omitted); *Wilson*, 492 F. Supp. 3d at 423 ("This Court and the Third Circuit have held that the amount in controversy is determined as of the date of removal; that is, a plaintiff may not subsequently amend a complaint so as to defeat federal jurisdiction." (citation and internal quotation marks omitted); *Mager v. Travelers Home and Marine Ins. Co.*, Civ. A. No. 19-2469, 2020 WL 211548, at *2 (E.D. Pa. Jan. 14, 2020) ("A plaintiff may not amend the complaint to try to defeat federal diversity jurisdiction after removal, if prior to removal, the complaint satisfied the monetary floor involving over $75,000."); *see also Dieffenbach v. CIGNA, Inc.*, 310 F. App'x 504, 507 (3d Cir. 2009) (per curiam) ("Dieffenbach also sought a remand in reliance on the amended complaint he filed after the District Court denied the first remand requests and dismissed the removed complaint. However, 'a subsequent amendment to the complaint after removal designed to eliminate the federal claim will not defeat federal jurisdiction.'" (quoting *Westmoreland Hosp. Ass'n*, 605 F.2d at 123)).

Here, Snapt does not appear to contend that the original complaint failed to include allegations that would satisfy the jurisdictional amount-in-controversy threshold; instead, it focuses only on the amended complaint. *See generally* Doc. No. 26. Nonetheless, the court does not find to a legal certainty that Snapt could not recover $75,000 based on the allegations in the original complaint. In this regard, the original complaint states that the plaintiffs (including Snapt) spent $43,000 with respect to purchasing and enhancing the App. *See* Compl. at ¶ 7, Doc. No. 1-1. In addition, the plaintiffs indicated that they sought the return of all subscriber fees from the

App from February 1, 2019, to date, and with interest. *See id.* at ¶ 45. Moreover, the plaintiffs alleged that they suffered "significant losses," *id.* at ¶ 46, and damages to their "commercial reputation." *Id.* at ¶ 52.

The plaintiffs also sought damages for the loss of the App. *Id.* at ¶ 48. In their requests for relief, the plaintiffs sought, *inter alia*, compensatory and consequential damages in each of the four counts of the complaint, and they sought punitive damages with respect to their conversion claim. *See id.* at 10, 11, 12, 13. Based on these allegations, the court cannot say to a legal certainty that the plaintiffs could not recover more than $75,000. *See Angus v. Shiley Inc.*, 989 F.2d 142, 146 (3d Cir. 1993) ("[T]he amount in controversy is not measured by the low end of an open-ended claim, but rather by a reasonable reading of the value of the rights being litigated.").[8]

Even if, as Snapt argues, the court were to only look at the amended complaint in determining the amount in controversy, it also appears that the amount in controversy exceeds $75,000 despite Snapt's attempt to limit the damages to $70,000. In this regard, and as noted above, the amended complaint still includes claims for lost revenue, harm to its reputation, and equitable relief. Also, while not discussed by either party, Snapt could recover separate damages for at least two of its three causes of action. For example, Snapt's conversion claim is seemingly based on Apple depriving it of its App subscription funds while also taking (upon information and belief) 30% of those funds despite being placed on notice that Apple was sending the funds to a thief. *See*

---

[8] Additionally, the plaintiffs appear to have believed that the amount exceeded $75,000 in their correspondence with Apple. *See, e.g.*, Sept. 1, 2021 Decl. of John J. Calandra at ¶¶ 3–7, Doc. No. 27-1. This information would also be sufficient, on an alternative basis, to demonstrate that the amount-in-controversy is satisfied in this case. *See, e.g.*, *Ketz v. Progressive N. Ins. Co.*, No. 3:07cv731, 2007 WL 1726514, at *3 (M.D. Pa. June 14, 2007) ("Here, on September 18, 2006, plaintiffs made a settlement demand of $200,000. Consequently, we alternatively find the statutory minimum of $75,000 satisfied because an independent appraisal of the claim's value reveals an amount in controversy of $200,000. Diversity jurisdiction pursuant to 28 U.S.C. § 1332 is established.").

Am. Comp. at ¶¶ 49–50. Snapt could also separately recover for its intentional interference with contractual/business relations claim, which is based on Apple interfering with Snapt's contractual business relations with the App's subscribers. *See id.* at ¶ 53. Snapt alleges that this interference "severed [Snapt] from [its] contractual and business relations with each of [its] existing and prospective [App] subscribers." *Id.* at ¶ 54.

As demonstrated by the language Snapt uses in its amended complaint, it is claiming different harms and seeking different recoveries for these two causes of action. Thus, even though Snapt purports to limit the amount of monetary relief sought in each count to $70,000, Snapt could recover up to $70,000 in each count, for a total of $140,000. *See, e.g.*, *Myers v. State Farm Mut. Auto. Ins. Co.*, Civ. A. No. 17-3509, 2017 WL 3592031, at *3 (E.D. Pa. Aug. 21, 2017) (denying motion to remand after determining amount in controversy exceeded jurisdictional amount in case where plaintiff sought recovery in excess of $50,000 for underinsured motorist benefits (where the applicable coverage was $25,000/$50,000) and also sought damages for bad faith in an amount in excess of $50,000).[9]

---

[9] The court recognizes that one of the amounts that Apple seeks to add to the total amount in controversy is attorney's fees. *See* Remand Opp'n at 6. Although attorney's fees can be added to the amount in controversy in some circumstances, it appears that the court may do so only if the plaintiff could actually receive those fees in the case. *See Suber v. Chrysler Corp.*, 104 F.3d 578, 585 (3d Cir. 1997) ("[I]n calculating the amount in controversy, we must consider potential attorney's fees. Although 28 U.S.C. § 1332 excludes 'interest and costs' from the amount in controversy, attorney's fees are necessarily part of the amount in controversy ***if such fees are available to successful plaintiffs under the statutory cause of action***." (emphasis added) (citation omitted)); *State Farm Mut. Auto. Ins. Co. v. Powell*, 87 F.3d 93, 98 (3d Cir. 1996) ("[W]here the underlying instrument or contract itself provides for their payment, costs and attorneys' fees must be considered in determining the jurisdictional amount." (internal quotation marks omitted)). Here, no party identifies any law indicating that the Snapt could recover attorney's fees if it was to prevail on any of its causes of action in this case. The court has also not located any provision that would entitle Snapt to recover attorney's fees if it prevails in this case.

**B.      Apple's Motion to Transfer Venue[10]**

In its motion to transfer venue, Apple asserts that this court must transfer this action to the United States District Court for the Northern District of California based on a forum selection clause. *See* Mem. of Law in Supp. of Def. Apple Inc.'s Mot. to Dismiss, or in the Alternative to Transfer ("Apple Mem.") at 16–20, Doc. No. 23-1. Apple indicates that it has a "Developer Program License Agreement" ("DPLA"), which every app developer must agree to for the developer to distribute an app on the Apple Store. *See id.* at 16. Section 14.10 of the DPLA contains a broad forum selection clause:

> Any litigation or other dispute resolution between You and Apple arising out of or relating to this Agreement, the Apple Software, or Your relationship with Apple will take place in the Northern District of California, and You and Apple hereby consent to the personal jurisdiction of an exclusive venue in the state and federal courts within that District with respect [to] any such litigation or dispute resolution.

*Id.*; *see also* June 25, 2021 Decl. of John J. Calandra ("June 2021 Calandra Decl."), Ex. A, Doc. No. 23-2.

Apple asserts that if Snapt claims that it acquired the revenue sharing rights of the App, it would have had to have been assigned the prior developer's rights under its DPLA with Apple. *See* Apple Mem. at 17. Apple claims that Snapt is attempting to avoid the terms of the DPLA that it does not like, such as the venue provision, while also trying to enforce rights it could only have if it was assigned rights under the DPLA, such as the ability to receive revenue from subscriptions to the App. *See id.* at 4. Apple also points out that Snapt is essentially acknowledging that this

---

[10] Although Apple also moved to have the court dismiss the amended complaint, the court directed the parties to focus on Apple's motion to transfer venue. *See* Aug. 19, 2021 Order at 1 (requiring parties to brief only motion to transfer venue), Doc. No. 25. The court also heard argument on only the motion to remand and motion to transfer venue. *See id.*

agreement applies as it asserts California law applies to this lawsuit. *See id.* (citing Am. Compl. at ¶¶ 35, 36).[11]

Apple notes that a valid forum selection clause is properly enforced via a motion to transfer pursuant to 28 U.S.C. § 1404(a). *See id.* at 17 (citations omitted). It also argues that the court should enforce the forum selection clause in the DPLA because (1) it is valid and not the result of fraud or overreaching; (2) litigation in California is not inconvenient or unreasonable; (3) enforcement of the DPLA does not violate public policy; and (4) there are no extraordinary circumstances precluding transfer. *See id.* at 17–20.

In response to Apple's motion, Snapt indicates that Apple has admitted in its memorandum of law that Snapt was never a party to the DPLA. *See* Mem. of Law in Supp. of Pl.'s Opp'n to Def.'s Mot. to Transfer at 3, Doc. No. 28. In this regard, Snapt points out that Apple admits that the DPLA cannot be assigned without Apple's express prior written consent, and Snapt never states that it ever sought such consent. *See id.* at 3–4. In addition, Apple's attorneys informed Snapt's attorney that Snapt never followed Apple's procedures for transferring ownership of an app, including by not seeking Apple's approval of an assignment of the DPLA. *See id.* at 3–4. At bottom, Snapt argues that "as [it] was not assigned the Agreements, [it] did not step into the shoes of the TZ App Developer, and the exclusive forum selection clause contained in those Agreements is invalid and not binding upon [it]." *Id.* at 4.

Snapt also contends that the private and public interest considerations support this court keeping the case here. *See id.* at 5–6. Snapt asserts that Apple bears the burden of persuasion to

---

[11] The DPLA directs that California law applies: "This Agreement will be governed by and construed in accordance with the laws of the United States and the State of California, except that body of California law concerning conflicts of law." June 2021 Calandra Decl., Ex. A at § 17.

justify transferring the case. *See id.* at 5 (citing *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995)). It also points out that (1) Snapt is the plaintiff and chose this forum (or actually, chose the Court of Common Pleas of Berks County as the forum), (2) Snapt is a local company and keeping local controversies close to home is a key factor in keeping the case here, (3) Snapt is a small business, a "David" to Apple's "Goliath," and (4) if the court transfers the case, costs of travel, as well as Snapt needing local California counsel, will be "crushing" to Snapt relative to the damages it seeks from Apple. *See id.* at 5–6.

In its reply to Snapt's opposition arguments, Apple points out that Snapt has its own developer contract with Apple and, thus, Snapt has improperly focused on the prior developer's contract with Apple. *See* Def. Apple Inc.'s Reply in Supp. of its Mot. to Transfer at 1, 2, Doc. No. 29. Apple notes that Snapt does not dispute in its opposition that it entered into an agreement with Apple, nor can it given that it alleges that it launched three separate apps through Apple's App Store. *See id.* at 3 (citations omitted).

Apple indicates that Snapt's DPLA "selects the Northern District of California as the exclusive venue for a broad set of claims and disputes." *Id.* Also, it points out that at least one district court has held that the plain language of the forum selection clause warrants transfer because it covers any dispute with Apple relating to its "relationship with Apple." *Id.* (citing *Coronavirus Rep. v. Apple, Inc.*, No. 21-CV-47-LM, 2021 WL 1946428, at *4–5 (D.N.H. May 14, 2021), *recons. denied*, 2021 WL 2722985 (D.N.H. July 1, 2021)).[12]

---

[12] In *Coronavirus Rep.*, the court granted a motion to transfer while holding that "[t]he forum selection clause at issue is even broader . . . because its scope extends not merely to claims relating to the License Agreement but also to claims relating to the 'relationship' between plaintiff and Apple." 2021 WL 1946428, at *4–5.

In addition to claiming that Snapt is bound by a forum selection clause in its agreement with Apple, Apple also claims that Snapt is bound by the forum selection clause in the prior developer's agreements because (1) it is claiming benefits from that contract, *i.e.,* the developer's rights to the revenue share, and (2) it is a closely related party as it is the successor in interest and purchaser of the App. *See id.* at 5–8. Apple argues that Snapt cannot attempt to avoid enforcement of the forum selection clause in an agreement by which it (1) acknowledges having already received a direct benefit from Apple in the form of the subscriber fees from the App and (2) bases its claim for damages on an alleged continuing interest in receiving that benefit. *See id.* at 8.

As a final argument, Apple reiterates that the relevant interests favor transferring the case. *See id.* at 8–9. It points out that the public interests favor a transfer because Snapt's reasons for not transferring, such as its nature as a small business and the probability that it will have to expend money on travel and local counsel, are private interests and not public interests. *See id.* at 9. Also, although Snapt mentions a local interest in having local controversies decided at home, it does not articulate the specific interest that Pennsylvania has in this litigation. *See id.* On the contrary, Apple notes that California has a strong nexus to this litigation: Apple is located there; the alleged wrongful acts occurred there; relevant documents and witnesses are located there; and Snapt previously had an address in California. *See id.*

After reviewing the parties' arguments, the court finds that transferring this action to the United States District Court for the Northern District of California is appropriate in this case. This court, "for the convenience of the parties and witnesses, in the interest of justice, . . . may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a).

In addressing Apple's motion to transfer, the court may consider documents outside the four corners of the operative complaint. *See Universal Atl. Sys., Inc. v. Honeywell Int'l, Inc.*, No. 17-4660, 2018 WL 1757727, at *2 (E.D. Pa. Apr. 12, 2018) (explaining that a "court may consider affidavits and other evidence outside the pleadings when adjudicating a motion to transfer under 28 U.S.C. § 1404(a)"). If there is a valid mandatory forum selection clause, it must be "given controlling weight in all but the most exceptional cases." *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 60 (2013).

In addition, a valid forum selection clause "requires district courts to adjust their usual § 1404(a) analysis in three ways." *Id.* at 63. "First, the plaintiff's choice of forum merits no weight. Rather, as the party defying the forum selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Id.* "Second, a court evaluating a defendant's § 1404(a) motion to transfer based on a forum-selection clause should not consider arguments about the parties' private interests [because w]hen parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Id.* at 64. "Third, when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice of law rules—a factor that in some circumstances may affect public-interest considerations." *Id.* "As a consequence, a district court may consider arguments about public-interest factors only." *Id.* (citation omitted).[13] Also, "[b]ecause those factors will rarely defeat a

---

[13] Public interest factors include: (1) enforceability of the judgment; (2) practical considerations which could make the trial easy, expeditious, or inexpensive; (3) relative administrative difficulties in the two fora resulting from court congestion; (4) local interests in deciding local controversies at home; (5) public policies in the fora; and (6) the

transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Id.*

Here, the record demonstrates that Snapt had a DPLA with Apple and that the DPLA is valid and enforceable. There is no evidence (or allegations) that there was fraud, undue influence, or "overweening bargaining power" in this case. *See Jumara*, 55 F.3d at 880. As such, Snapt would bear the burden of "demonstrating why [it] should not be bound by [its] contractual choice of forum." *Id.*

In addition to there being no evidence of fraud or overreaching, there is also no evidence in the record that enforcement of the forum selection clause in the DPLA would violate a strong public policy of the forum, or that its enforcement would result in litigation so seriously inconvenient and unreasonable that it would deprive Snapt of its day in court. *See M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15–17 (1972); *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 246 (E.D. Pa. 2007) ("The objecting party must show that (1) the forum selection clause is the result of fraud or overreaching, (2) its enforcement would violate a strong public policy of the forum, or (3) its enforcement would result in litigation so seriously inconvenient and unreasonable that it would deprive a litigant of his or her day in court.").

As for the public interest factors, Snapt has not shown that the public interest factors overwhelming disfavor transferring the case to the Northern District of California. As noted by Apple, the factors Snapt discusses in its brief mostly relate to private factors, such as the fact that it is a small business (especially when compared to Apple) and that there could be additional costs

---

familiarity of the trial judge with the applicable state law in diversity cases. *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879–80 (3d Cir. 1995).

associated with travel and hiring local California counsel. Snapt does not assert that any judgment in this case could not be enforced in California, that there are practical considerations that could make the trial easier, more expeditious, or inexpensive here, that there is an issue with court congestion in the Northern District of California, that there is an aspect of the public policies in the Northern District of California that would disfavor transfer, or that a district judge sitting in the Northern District of California would not be familiar with the applicable state law in this diversity case, especially, as Snapt appears to acknowledge that California law would apply to at least its bailment claim. *See* Am. Compl. at ¶¶ 36–37. The court recognizes that Snapt includes persuasive arguments that it would be inconvenient to litigate this matter in California insofar as, *inter alia*, it is based out of Berks County and will need to hire local counsel in California. Nonetheless, as Apple points out, Snapt would have certain interactions with California as part of this litigation due to Apple being based in California, even if the case were to remain in this court.

Accordingly, while the court understands and appreciates Snapt's desire to have this case heard in this forum, especially as it initially sought to have the case litigated in Berks County, there is a valid forum selection clause at issue, and it very broadly covers the claims Snapt is attempting to assert in this case against Apple. In addition, Snapt has not shown that litigating this matter in the Northern District of California would be so inconvenient or unreasonable that it would deprive it of its day in court. Furthermore, an analysis of the public interest factors does not "overwhelming disfavor a transfer" of this case to the Northern District of California. As such, the court will grant Apple's motion and transfer this case to the Northern District of California.

## III.    CONCLUSION

For the reasons stated above, the court will deny Snapt's motion to remand this matter to the Court of Common Pleas of Berks County. The court will also grant Apple's motion to transfer and will transfer this case to the United States District Court for the Northern District of California.

The court will enter a separate order.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.